[Cite as *Freshwater v. Mt. Vernon City School Dist. Bd. of Edn.,* 137 Ohio St.3d 469, 2013-Ohio-5000.]

FRESHWATER, APPELLANT, *v.* MOUNT VERNON CITY SCHOOL DISTRICT BOARD

OF EDUCATION, APPELLEE.

[Cite as *Freshwater v. Mt. Vernon City School Dist. Bd. of Edn.,*

**137 Ohio St.3d 469, 2013-Ohio-5000.]**

*R.C. 3319.16 proceeding for termination of public school teacher's contract—*
*Good and just cause—Insubordination defined as a willful disobedience*
*of, or refusal to obey, a reasonable and valid rule, regulation, or order*
*issued by a school board or by an administrative superior.*

(No. 2012-0613—Submitted February 27, 2013—Decided November 19, 2013.)

APPEAL from the Court of Appeals for Knox County, No. 2011-CA-000023,

2012-Ohio-889.

————————————

**SYLLABUS OF THE COURT**

In a proceeding under R.C. 3319.16 for the termination of a public school
teacher's contract, "good and just cause" includes insubordination
consisting of a willful disobedience of, or refusal to obey, a reasonable and
valid rule, regulation, or order issued by a school board or by an
administrative superior.

————————————

**O'CONNOR, C.J.**

{¶ 1} In this appeal, we determine whether the evidence supports the
stated reasons for terminating the employment of a public school teacher,
appellant, John Freshwater, for introducing religion into his eighth-grade science
classes and for insubordination. More specifically, we must address whether the
evidence was sufficient to demonstrate that appellee, Mount Vernon City School
District Board of Education ("the board" or "the district"), terminated Freshwater

for insubordination in refusing to remove religious displays in his classroom after being told to do so, and for continuing to inject his personal religious beliefs into his plan and pattern of instruction, thereby exceeding the bounds of the school district's bylaws and policies, even after being forbidden to do so.

{¶ 2} After detailed review of the voluminous record in this case, we hold that the court of appeals did not err in affirming the termination. The trial court properly found that the record supports, by clear and convincing evidence, Freshwater's termination for insubordination in failing to comply with orders to remove religious materials from his classroom. Accordingly, based on our resolution of this threshold issue, we need not reach the constitutional issue of whether Freshwater impermissibly imposed his religious beliefs in his classroom. We affirm the judgment of the court of appeals because there was ample evidence of insubordination to justify the termination decision.

## RELEVANT BACKGROUND

{¶ 3} Mount Vernon School Board asserts that despite the district's instructions to cease doing so, Freshwater unequivocally injected his own Christian faith into his classroom as early as 1994 and continued to do so right up until he was relieved of his teaching duties. The board also asserts that after it denied Freshwater's 2003 teaching proposal to critically evaluate evolution, Freshwater surreptitiously supplemented his eighth-grade science curriculum with religious handouts, showed videos on creationism and intelligent design, displayed religious materials in his classroom, and made various statements in class referring to the Bible.

{¶ 4} Freshwater, on the other hand, argues that the board violated his right to academic freedom pursuant to the First Amendment to the United States Constitution when it terminated him based on the content or viewpoint of his curriculum-related academic discussions with students and his use of supplemental academic materials.

{¶ 5} We agree with the board and find that there is ample support for Freshwater's termination based upon insubordination. We resolve this case solely as a teacher-employment-termination case governed by R.C. 3319.16, which sets forth standards and procedures for termination of teaching contracts by boards of education. We need not address the various constitutional issues raised by Freshwater, because we resolve this appeal on an other-than-constitutional ground. *See, e.g., State ex rel. Essig v. Blackwell*, 103 Ohio St.3d 481, 2004-Ohio-5586, 817 N.E.2d 5, ¶ 34, citing *State ex rel. DeBrosse v. Cool*, 87 Ohio St.3d 1, 7, 716 N.E.2d 1114 (1999) ("Courts decide constitutional issues only when absolutely necessary").

### *Early Conduct*

{¶ 6} The legal battle in this case began largely in 2007, when a student and his parents alleged that Freshwater used a Tesla coil[1] in class to make a mark on the student's arm. But the antecedents of this case go back to 1994, when district administrators first instructed Freshwater not to distribute materials informing his students about a religious seminar. And district officials advised and counseled Freshwater multiple times about similar behavior in the 15 years that followed, directing him not to incorporate religious documents based upon creationism or intelligent design into his classroom instruction and to remove displays of religious materials from the classroom.

{¶ 7} The voluminous record here establishes, by clear and convincing evidence, that Freshwater has been insubordinate in the course of his employment with the district. For purposes of this appeal, however, we are specifically concerned with the occurrences of 2007 forward.

---

1. A Tesla coil, named after inventor Nikola Tesla, is "an air-core transformer for high-frequency alternating or oscillating electrical currents." *Webster's Third New International Dictionary* 2361 (1986). When the hand-held Tesla coil (also called a high-frequency generator) used for classroom demonstrations involved in this case is properly adjusted and its electrode is held near a metal object, a spark jumps from the coil to the metal.

**{¶ 8}** Thus, we find it necessary to review in detail the evidence presented in the hearing conducted by a referee considering whether termination was warranted and summarized in the referee's report issued after the hearing.

### *Background to the Referee's Report and the Evidence at the Hearing*

**{¶ 9}** After the hearing, which involved 38 different days of witness testimony spread out over almost 21 months, included more than 80 witnesses and hundreds of exhibits, and ultimately resulted in over 6,000 pages of transcript, the referee issued a report on January 7, 2011. In his report, the referee set forth the facts, including an overview of Freshwater's sometimes contentious teaching record.

**{¶ 10}** The referee addressed the four grounds asserted by the board in considering Freshwater's termination: (1) the Tesla-coil incident, (2) his failure to adhere to established curriculum, (3) his role as administration-appointed facilitator, monitor, and supervisor of the student group Fellowship of Christian Athletes ("FCA"), and (4) his disobedience of orders.

**{¶ 11}** The referee ultimately concluded in his report that grounds two and four were valid bases to support Freshwater's termination.

*Freshwater's teaching record and evaluations contain references to his incorporation of creationism and intelligent design in his classroom instruction*

**{¶ 12}** In 1987, the board hired Freshwater as an eighth-grade science teacher. In addition to his teaching duties, Freshwater served as the administration-appointed facilitator, monitor, and supervisor of the FCA for more than 15 years.

**{¶ 13}** Freshwater's students at Mount Vernon Middle School often performed at or above the state's standards and requirements in achievement testing. Dr. Lynda Weston, former director of teaching and learning for the district, testified that Freshwater's students' science scores on state standardized tests were "the highest of the three eighth grade science teachers."

{¶ 14} William Oxenford, a seventh-grade science teacher at Mount Vernon Middle School, also served as an academic-achievement coach. In the latter capacity, Oxenford was responsible for coordinating the implementation of strategies that would assist students in passing the achievement test. He confirmed that Freshwater's students had the highest performance level on achievements tests of the students taught by the three eighth-grade science teachers. Similarly, Kerri Mahan, a teacher at Mount Vernon Middle School who also served on the "data team" for improving standardized-test performance, testified that Freshwater's students "showed proficiency and achievement" on those tests.

{¶ 15} During his employment with the district, Freshwater received at least 20 performance evaluations. Almost all were positive. In fact, Freshwater had never been disciplined before the precipitating events. But Freshwater's teaching career certainly was not without controversy.

{¶ 16} Freshwater's evaluations and communications from his superiors repeatedly directed him to cease distributing documents that presented students with information about intelligent design and creationism. Freshwater was admonished a number of times to abide by the board's policy forbidding the teaching of religious thought in the curriculum.

{¶ 17} The first of these incidents occurred on September 19, 1994, when Freshwater received a memorandum from Jeff Kuntz, then the principal at Mount Vernon Middle School, regarding Freshwater's distribution to students of a handout entitled "Answers In Genesis" giving information about an upcoming seminar. The handout discussed in the memorandum described a "*free* meeting * * * for students * * * [to] learn the evidence that supports creation—and denies evolution." (Emphasis sic.) The handout also stated that the seminar would "reveal why it is vital to believe in Genesis as it is written * * * [and] declare that

many of the important issues in our troubled society (the breakdown of the family, abortion, lawlessness, etc.) are related to evolution!"

{¶ 18} In the memorandum, Kuntz instructed Freshwater to "please refrain from distributing materials not supported by your adopted course of study to students. Your classroom is not an appropriate format for disseminating information on religious seminars to students. In addition, please withdraw any extra credit you awarded to students who attended the 'Answers In Genesis' seminar."

{¶ 19} The record contains limited information of any occurrences for a number of years that followed, with no additional counseling or intervention regarding Freshwater documented until January 21, 2003. That day, Freshwater received a mostly positive evaluation from Kuntz, who noted specifically that "Mr. Freshwater utilizes a good variety of methods and materials in his classroom." But Kuntz also noted, under the section of the evaluation marked "Growth/Improvement Areas," that Freshwater should "[c]ontinue to adhere to board policy and guidelines 2270 with respect to Religion In The Curriculum (see attached)." Kuntz attached the board's policy and guidelines to Freshwater's evaluation and later testified that he did so because of "two different situations" that had occurred in the fall of 2002.

{¶ 20} The first situation Kuntz referred to evidently arose when some teachers from the high school, in particular one science teacher, spoke to Kuntz about her concern that she was having to "reteach" evolution to students in her high-school classes. That teacher believed that Freshwater was contributing to that problem.

{¶ 21} The second incident Kuntz referred to arose from a complaint from a parent concerning a handout that Freshwater had distributed. Notably, however, at the hearing, Kuntz could not "exactly" recall the handout or its content.

{¶ 22} Although the record does not reveal whether these complaints had merit, Kuntz decided to act because two complaints had been voiced within a reasonably short period of time and he felt that he could not ignore them. Therefore, Kuntz attached the board policy and guidelines on religion in the curriculum because he felt it was a "very appropriate" way to make a statement to Freshwater that was relevant to the concerns raised in the complaints.

{¶ 23} The record establishes two patterns in Freshwater's teaching career from 1994 through 2002—he repeatedly received positive evaluations of his teaching, and he repeatedly was advised not to distribute materials about creationism and intelligent design to students.

*Freshwater's proposal to "critically examine" evolution*

{¶ 24} Despite receiving prior instructions not to provide students with religious information, Freshwater submitted a proposal to the board in 2003 entitled "Objective Origins Science Policy." In that proposal, Freshwater requested that the board "[a]dd a policy statement to the MVCS [Mount Vernon City Schools] science curricula that allows teachers/students to critically examine the evidence both for and against evolution." More specifically, Freshwater asserted that one problem with teaching evolution was that "the Mount Vernon City Schools do not offer a place in the curricula to scientifically and critically examine this theory" and that "there is confusion among some MVCS science teachers over whether they are even allowed to encourage critical scientific thinking on evolution, even though it is considered excellent scientific reasoning to do so with any other controversial science theories (such as the particle versus wave theories on light)."

{¶ 25} The board rejected Freshwater's proposal. Its rejection was consistent with the State Board of Education's subsequent decision to strike language similar to Freshwater's proposal from the state of Ohio's Academic Content Standards for K-12 science. When first adopted, those standards required

schools to teach students to critically evaluate evolution, which is primarily taught in the eighth and tenth grades in Ohio's public schools. Specifically, part of the relevant benchmark for grades nine and ten then provided, "Describe how scientists continue to investigate and critically analyze aspects of evolutionary theory. (The intent of this benchmark does not mandate the teaching or testing of intelligent design.)" The accompanying achievement indicator for grade ten tracked this language. But on February 14, 2006, the State Board of Education modified the above-mentioned benchmark and indicator to remove the foregoing language from its standards. Thus, the state no longer required or encouraged schools to teach students to critically evaluate evolution.

{¶ 26} But neither the board's denial of his proposal nor the State Board of Education's decision dissuaded Freshwater from teaching as if his proposal had been adopted.

{¶ 27} On April 7, 2006, Paul Souhrada, a parent of one of Freshwater's students, submitted a complaint form to the district. In it, Souhrada alleged that on April 4, 2006, Freshwater distributed a handout to his son's class entitled "Darwin's Theory of Evolution—The Premise and the Problem." Although Freshwater apparently collected the handouts at the end of class, Souhrada's son kept his and gave it to his father. Souhrada checked the source of the information contained in the handout. In his complaint, he wrote that the handout came from "All About God Ministries" and stated, "I don't believe that is a proper source for science material, especially in light of the state school board's decision in February to strike language regarding the critical evaluation of evolution from the state guidelines."

{¶ 28} Six weeks later, on May 26, 2006, Charles Adkins, a science teacher at Mount Vernon Middle School, and Richard Cunningham, the science-department chairperson at Mount Vernon High School, wrote an e-mail to Weston and the district's superintendent at the time, R. Jeff Maley, in response to Maley's

request that the school district review the handout mentioned in Souhrada's complaint. Adkins and Cunningham stated that they had investigated the possible sources of the handout and examined the associated media related to the topic and had determined that the handout, as well as the original source of the material, had not passed the test of scientific peer review and acceptance by the scientific establishment. Neither of them was able to attribute this handout to a particular author, but they opined that the handout appeared in part or in its entirety on several intelligent-design websites.

{¶ 29} After reviewing the complaint and researching the handout, Adkins and Cunningham met with Weston and Freshwater so that Freshwater could provide background information regarding the handout's alignment with the Ohio content standards, benchmarks, and indicators. Adkins and Cunningham wrote in the e-mail to Maley that Freshwater's "explanation [did] not match the direction or the tone of the article." They also concluded that the "handout is inappropriate as an instructional resource for the grade level content benchmarks and indicators."

{¶ 30} On June 8, 2006, Maley directed Freshwater, in writing, to cease use of the handout and similar materials. Maley wrote,

> After review, I have determined the material in question cannot be attributed to a particular author or source. The material has not passed the test of scientific review and acceptance of the established scientific community. I am directing you to delete the material from your supplemental resources. Also, in the future please refrain from using materials that the source or author cannot be readily identified.

Maley subsequently emphasized that his main concern with the material was that it did not have a source and that the failure to provide sources was "bad practice."

{¶ 31} Despite this warning and the prior incidents in which Freshwater had been warned not to distribute religious materials, there is no indication in the record suggesting that the district took adverse action against Freshwater for his practice of failing to cite sources in supplemental materials or his prior transgressions. But the following school year, new allegations arose that raised serious questions about Freshwater's compliance with the directives of Superintendent Maley and his continued status with the district.

*The allegations*

{¶ 32} On December 7, 2007, Stephen and Jenifer Dennis met with Stephen Short, then the interim superintendent for the district. Their son was one of Freshwater's eighth-grade science students and a participant in the FCA. The Dennises complained that on the day before, December 6, 2007, Freshwater used a Tesla coil to make a mark on their son's arm that appeared to be in the shape of a cross.

{¶ 33} On December 10, 2007, Short met with William White, Mount Vernon Middle School principal, to investigate and determine what had taken place in Freshwater's classroom. Later that same day, White met with Freshwater to discuss the incident. Freshwater admitted to White that he had used the Tesla coil on students during class and that he had used it to put an "X" on the Dennises' son's arm. But he also testified that he did not see that he had made any significant lasting mark on the student, let alone a mark in the shape of a cross.

{¶ 34} On January 22, 2008, White wrote a letter to Freshwater as a follow-up to their conversation on December 10. White stated that "the electrostatic machine(s) should not be used for purposes of shocking students" and "the machine(s) should be removed from the classroom or locked up so that

the students do not have access to" them. White testified that after sending the letter to Freshwater, he never heard a single word or further complaint from the Dennises about the mark on their son's arm until the Dennises filed suit against the board in April 2008.

{¶ 35} But in the intervening period, White heard several other concerns about Freshwater from the Dennises. For example, the Dennises complained about the manner in which Freshwater advised the FCA. They alleged that Freshwater was operating in an improper leadership role by directly participating in the organization's affairs rather than simply monitoring it. Direct faculty participation in the organization was a violation of the FCA's rules, which require that FCA clubs must be voluntary, student-initiated, and student-led.

{¶ 36} The district was also aware that Freshwater allegedly was not enforcing the required permission-slip policy for FCA events, was contacting speakers himself rather than having the students do so, and allegedly had conducted a healing session for a speaker who appeared at an FCA event who had been ill.

{¶ 37} The Dennises also complained that Freshwater had religious materials in the classroom.

{¶ 38} On April 7, 2008, White met with Freshwater about these issues. White then instructed Freshwater, in clear and unequivocal writing, that Freshwater could not display religious materials in his classroom:

> With regard to religious materials in your classroom, it has been brought to my attention that you have a bible out on your desk and that the "collage" on your classroom window includes the 10 commandments. While you certainly may read your bible on your own, duty free time [i.e. during lunch], it cannot be sitting out on your desk when students are in the classroom and when you are

supposed to be engaged in your responsibilities as a teacher. As for the 10 commandments, that part of your collage must be taken down and replaced with something that is not religious in nature. As a public school teacher, you cannot engage in any activity that promotes or denigrates a particular religion or religious beliefs while on board property, during any school activity or while you are "on duty" as a teacher. Unless a particular discussion about religion or religious decorations or symbols is part of a Board approved curriculum, you may not engage in religious discussions with students while at school or keep religious materials displayed in the classroom.

{¶ 39} On April 11, 2008, White once again met with Freshwater regarding the need to remove overtly religious icons and materials from display in his classroom.

{¶ 40} And on April 14, 2008, White yet again gave written instructions "to follow up" on his prior meetings, conversations, and writings with Freshwater regarding religious items in Freshwater's classroom. White's letter directed that "all religious items need to be removed from your classroom by the end of the day on Wednesday, April 16, 2008. Bibles and other religious DVD's, videos, etc. should also be placed out of sight and access of the students by this date." Freshwater signed the letter as acknowledgment of his receipt.

{¶ 41} But evidently, Freshwater was far from compliant. Despite having been directed repeatedly to remove the Bible and other religious items from his classroom, Freshwater proceeded to the school's library, where he checked out two books, *Jesus of Nazareth* and the *Oxford Bible*. He then displayed them on a lab table in his classroom rather than keeping them from his students' sight.

{¶ 42} And on April 16, 2008, the date by which he had been ordered to remove religious material from his classroom, Freshwater submitted a written statement refusing to remove the Bible from his classroom.[2]

{¶ 43} As these events were unfolding, the Dennises' attorney was formulating a letter to Short regarding what the Dennises believed to be "several instances of violations of the Establishment Clause of the First Amendment." The letter, dated April 14, 2008, set forth eight alleged violations in bulletpoint fashion, including the Tesla-coil incident and regarding Freshwater's behavior during FCA activities. As to one violation, the Dennises alleged that the Ten Commandments were displayed in Freshwater's classroom and several Bibles were also kept in the classroom as a display to his students, not for his personal use. The Dennises averred, "This display represents an ostensible and predominant purpose of advancing religion and violates that central Establishment Clause value of official religious neutrality." This allegation was supported by citing *McCreary Cty., Kentucky v. Am. Civ. Liberties Union of Kentucky*, 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005).

{¶ 44} The Dennises also claimed that Freshwater teaches his personal beliefs, from the Bible, in his eighth-grade science class. According to the Dennises, students were taught the meaning of Easter and Good Friday in their science class. The Dennises further asserted that whenever Freshwater disagrees, based upon his own religious beliefs, with teaching material, he advises the students that although he is forced to teach from the textbooks, the teachings are wrong or not proven according to the Bible.

{¶ 45} In their letter, the Dennises requested three remedies: (1) the immediate removal of the Bibles and the Ten Commandments display, (2)

---

2. By that date, Freshwater had removed the Ten Commandments from the collage in his classroom, but he refused to remove a poster depicting a Biblical verse above a photograph of former President George W. Bush and former Secretary of State Colin Powell in prayer with other government officials.

Freshwater's removal from both the classroom and his leadership role in the FCA as well as the commencement of an investigation regarding his violation of the laws of this country and the policies of the district, and (3) an agreement by the district to correct the concerns they raised and to follow the law.

{¶ 46} Counsel for the Dennises sent a follow-up letter on April 21, 2008, alleging a ninth violation by Freshwater. That letter alleged that since the date of the April 14, 2008 letter, Freshwater had continued to teach religion in his classroom, including the assignment of extra-credit work regarding intelligent design. Counsel wrote that it was obvious that Freshwater had not ceased his religious teachings and that the district nevertheless continued to allow Freshwater to teach eighth-grade science.

*Investigation by H.R. On Call, Inc.*

{¶ 47} In response to the Dennises' claims, the district engaged an independent investigator, H.R. On Call, Inc. ("HROC"),[3] to investigate the allegations. Beginning on April 23, 2008, and continuing through the end of the school year, a monitor sat in Freshwater's classroom and took notes of classroom observations and of statements made in class. HROC investigated the Dennises' nine concerns, along with the complaint from April 2006 regarding the handout on Darwin that Freshwater had used in class, by interviewing the Dennises' child, former and current students, and 18 teachers and administrators, including Weston.

{¶ 48} In its summary of findings, HROC found that Freshwater's teaching of evolution was not consistent with the district's curriculum and state standards. Specifically, HROC found that Freshwater taught creationism or intelligent design and the unreliability of carbon dating as reasons to support opposing evolution and that he discussed the meaning of Easter and Good Friday

---

3. According to the testimony of HROC's owner at the hearing, HROC is "a human resources consulting firm that provides a full range of human resource services to clients."

with his students. Moreover, HROC found that Freshwater distributed materials from religious sources challenging evolution and then collected the materials back from the students in spite of specific directives not to teach religion, creationism, or intelligent design. In addition, HROC recounted evidence that Freshwater had told students that "science is wrong because the Bible states that homosexuality is a sin." HROC concluded that Freshwater taught his religious beliefs in his classes.

{¶ 49} HROC also found that Freshwater gave an extra-credit assignment for students to view the movie *Expelled*, which is about intelligent design.

{¶ 50} HROC's report included a finding that Freshwater was insubordinate by failing to remove all religious materials from his classroom as ordered by his superior, Principal White.

{¶ 51} HROC issued its 15-page report on June 19, 2008.

*Board resolutions*

{¶ 52} On June 20, 2008, the board unanimously passed a resolution titled "Intent to Consider the Termination of the Teaching Contract of John Freshwater."[4]

{¶ 53} The board resolution set forth four grounds for Freshwater's termination: (1) the Tesla-coil incident, (2) his failure to adhere to established curriculum, (3) his role as facilitator, monitor, and supervisor of the FCA, and (4) his disobedience of orders.

---

4. On July 7, 2008, the board unanimously passed an amendment to the June 20, 2008 resolution, to change erroneous mentions of "American Content Standards" in the initial resolution to "Academic Content Standards" wherever that term appeared.

### *Referee's Report*

**{¶ 54}** On June 30, 2008, Freshwater requested a public hearing pursuant to R.C. 3319.16. That request was honored, and the protracted hearing ensued. In his subsequent report and findings, the referee addressed the four specified grounds for Freshwater's termination as set forth above in the board's resolution.

### *Ground One: Tesla-coil incident*

**{¶ 55}** The referee found that the Tesla-coil incident "became the focus of the curious * * * and print media" due to the sensational and provocative nature of the allegation. He also found that once sworn testimony was presented regarding the incident, it became obvious that "speculation and imagination had pushed reality aside." He found that the Tesla-coil issue was at an end as soon as White instructed Freshwater to stop using it. Freshwater did in fact stop using the Tesla coil for any purpose thereafter. Thus, the referee found that the Tesla-coil incident did not seem to be a proper subject for the amended resolution.

### *Ground Two: Freshwater's failure to adhere to established curriculum*

**{¶ 56}** The referee found that Freshwater injected his personal religious beliefs into his plan and pattern of instruction of his students. According to the referee, in so doing Freshwater exceeded the bounds of all pertinent board policies and bylaws, including "Religion in the Curriculum," "Controversial Issues," "Religious/Patriotic Ceremonies and Observances," "Religious Expression in the District," and "Academic Freedom of Teachers." The referee found that Freshwater instructed his students to examine evidence both for and against evolution, as if his proposed policy for doing so had been adopted by the board, and that Freshwater presented evidence against evolution by passing out and collecting handouts and showing videos. The evidence against evolution was based upon the Christian religious principles of creationism and intelligent design, running afoul of the board's policies entitled "Religion in the Curriculum" and "Religious/Patriotic Ceremonies and Observances."

**{¶ 57}** The referee relied on testimony by Jim Stockdale, a retired teacher from the district. Stockdale testified that in the fall of 2006, he was a substitute special-education teacher and that he accompanied his students into Freshwater's classroom and sat in one of the student desks in the back.[5]

**{¶ 58}** Stockdale testified that Freshwater started the class on a new unit regarding the origin of the universe. According to Stockdale, Freshwater stated that "oftentimes scientists and information in textbooks are incorrect" and that as an example Freshwater stated that in an article in *Time* magazine, scientists had found a genetic link to homosexuality. But, Stockdale testified, Freshwater then told the students that the "scientists in the article were wrong because the Bible states that homosexuality is a sin, so anyone who chooses to be a homosexual is a sinner; and that, therefore, science can be wrong, scientists can be wrong." Then, Freshwater concluded that the material in the textbook in that particular unit could be incorrect.

**{¶ 59}** The referee concluded:

> [I]n one incident, witnessed by an experienced and seasoned educator, John Freshwater not only injected his subjective, biased, Christian religion based, non-scientific opinion into the instruction of eighth grade science students but also gave those students reason to doubt the accuracy and or veracity of scientists, science textbooks, and/or science in general.

---

5. Freshwater disputes Stockdale's testimony and argues that Stockdale was not present in his classroom in the fall of 2006 and therefore could not have witnessed the alleged statement. The referee, however, found Stockdale's testimony credible and, in fact, called it "[p]erhaps the most egregious example" of Freshwater's failure to adhere to established curriculum. Although Freshwater contests Stockdale's testimony, we defer to the referee's findings of fact.

*Ground Three: Freshwater's role as facilitator, monitor, and supervisor of FCA*

**{¶ 60}** Regarding ground three, the referee stated that although "Freshwater was provided a copy of the guidelines for the conduct of [FCA] on more than one occasion * * *, Freshwater did not follow the guidelines implicitly." The referee concluded that there were several acts—Freshwater instituting a prayer, admitting to putting his hands up during a prayer, and praying for a guest speaker—that constituted violations of the FCA Handbook for Public Schools. However, the referee did not discuss these violations in later setting forth his conclusions regarding Freshwater's termination.

*Ground Four: Freshwater's disobedience of orders*

**{¶ 61}** Regarding ground four, which is dispositive for purposes of our opinion, the referee stated that school administrators were concerned about materials displayed in Freshwater's classroom, including the "handwritten Bible verses, videos, posters, and a Living Bible." The referee also found that White was assigned the task of implementing a plan of corrective action. The referee further stated:

> Beginning on April 7, 2008 [White] had several contacts with John Freshwater both in person and in writing. Principal White testified that "there were several meetings and several conversations in April." He further testified that multiple contacts with John Freshwater became necessary "because the things that I had asked to happen on April 7th were not attended to." Granted, there may have been some confusion about the instructions, orders, and directives which Mr. White gave John Freshwater. However, it is abundantly clear that what may have begun as confusion soon transformed into defiance.

18

Between April 7th and April 16, 2008, Mr. White clarified and reiterated the directives. Finally, he was forced to set a deadline for compliance—April 16, 2008. Two days prior (April 14, 2008), Mr. White and John Freshwater had a discussion about whether his disobedience would constitute insubordination. He (Freshwater) was told that it would be. Nevertheless, John Freshwater decided to comply only in part. * * * [Freshwater] also decided to add another element to the controversy. He checked out [two] religious texts from the school library and [testified that he positioned them on his lab table in his classroom]. John Freshwater's explanation for this act included the phrases "it was a curiosity" and "it's my inspiration." These explanations seem questionable. The act appears to have been one of defiance, disregard, and resistance.

When Mr. White returned to John Freshwater's classroom on April 16, 2008 to see if his directives had been followed, he discovered that they had not been. His testimony recounts his observations[:] "Almost everything had been removed, but there was still the Colin Powell poster * * * out of the school library he had checked out the Bible and had a book called Jesus of Nazareth." John Freshwater admitted that he had not removed the Colin Powell poster. He explained * * * "with that poster, that's a patriotic poster of our Commander and Chief" * * * "and I don't recall being told to remove it."

(Ellipses sic; citations to transcript omitted.)

*Referee's conclusions*

{¶ 62} The referee concluded that pursuant to R.C. 3319.16, a teacher may be terminated for "good and just cause," meaning that "the conduct of the teacher in question must constitute a 'fairly serious matter,' " quoting *Hale v. Lancaster Bd. of Edn.*, 13 Ohio St.2d 92, 99, 234 N.E.2d 583 (1968). The referee found that Freshwater's conduct constituted a fairly serious matter and was therefore "a valid basis for his termination in accordance with ORC 3319.16." Specifically, the referee stated:

John Freshwater was given ample opportunity to alter or adjust his content and style of teaching so as to avoid running headlong into the Establishment Clause and the Policy/Bylaws of the Mount Vernon Board of Education. Instead, he persisted in his attempts to make eighth grade science what he thought it should be—an examination of accepted scientific curriculum with the discerning eye of Christian doctrine. John Freshwater ignored the concept of in loco parentis and, instead, used his classroom as a means of sowing the seeds of doubt and confusion in the minds of impressionable students as they searched for meaning in the subject of science.

John Freshwater purposely used his classroom to advance his Christian religious views knowing full well or ignoring the fact that those views might conflict with the private beliefs of his students. John Freshwater refused and/or failed to employ objectivity in his instruction of a variety of science subjects and, in so doing, endorsed a particular religious doctrine. By this course of conduct John Freshwater repeatedly violated the Establishment Clause. Without question, the repeated violation of the

20

Constitution of The United States is a "fairly serious matter" and is, therefore, a valid basis for termination of John Freshwater's contract(s). Further, he repeatedly acted in defiance of direct instructions and orders of the administrators—his superiors. These defiant acts are also a "fairly serious matter" and, therefore, a valid basis for termination of John Freshwater's contract(s).

{¶ 63} The referee's final recommendation was that the board terminate Freshwater's contract for good and just cause.

### Freshwater's Termination

{¶ 64} On January 10, 2011, the board, relying on the referee's report, adopted it by a four-to-one vote and found that two main grounds (ground two, his failure to adhere to established curriculum, and ground four, his disobedience of orders) constituted good and just cause for the termination of Freshwater's teaching contract.

{¶ 65} As to ground two, the board found that Freshwater injected his personal religious beliefs into his plan and pattern of instructing his students. In doing so, the board found, "he exceeded the bounds of all the pertinent Bylaws/Policies of the Mount Vernon City School District."

{¶ 66} As to ground four, the board found that "Freshwater acted in defiance of direct instructions and orders of the administrators" by failing to comply with the directive to remove or discontinue the display of all religious articles in his classroom, including all posters of a religious nature and had "brought additional religious articles into his classroom, in a direct act of insubordination."

{¶ 67} The board determined that "each individual action independently constitutes 'good and just cause' for the termination of Mr. Freshwater's teaching

contract(s), whether considered individually or jointly," and it therefore terminated Freshwater's employment contract with the school district.

{¶ 68} On January 11, 2011, Barbara Donohue, treasurer of the school district, sent Freshwater a letter informing him of the board's vote to terminate his contract at the board meeting.

*Procedural History*

{¶ 69} After his termination, Freshwater brought suit in the Knox County Common Pleas Court to appeal the board's resolution terminating his contract and to request that the trial court conduct additional hearings. The trial court reviewed the referee's report and the evidence and found that there was clear and convincing evidence to support the board's termination of Freshwater's employment "for good and just cause." Thus, the trial court affirmed the board's resolution.

{¶ 70} Freshwater appealed to the Fifth District Court of Appeals. In his sole assignment of error, he argued that the trial court abused its discretion in finding that there was clear and convincing evidence to support the board's termination of his employment contract for good and just cause, in affirming the board's termination of his employment contract, and in ordering him to pay the costs of the appeal. 2012-Ohio-889 at ¶ 15.

{¶ 71} The court of appeals affirmed. In doing so, the appellate court held that pursuant to *Graziano v. Amherst Exempted Village Bd. of Edn.*, 32 Ohio St.3d 289, 513 N.E.2d 282 (1987), it was compelled to affirm the trial court's judgment unless it determined that the trial court abused its discretion. *Id*. at ¶ 21. In its analysis, the court of appeals held that it did not

> perceive an "unreasonable, arbitrary or unconscionable attitude,"
> nor one that is "not merely error of judgment, but [one of]
> perversity of will, passion, prejudice, partiality, or moral

22

delinquency." To the contrary, the referee's memorandum provides a well-reasoned and articulated basis for affirming the decision of the Board and for the trial court to accept the recommendation of the referee.

*Id*. at ¶ 22.

**{¶ 72}** The appellate court held that pursuant to *Graziano*, the " 'report *and recommendation* undertaken by the referee pursuant to R.C. 3319.16 must be considered and weighed by the board of education,' " and that " 'due deference must be accorded to the findings and recommendations of the referee * * * who is best able to observe the demeanor of the witnesses and weigh their credibility.' " (Emphasis added by the appellate court.) *Id*. at ¶ 23, quoting *Graziano* at 293. The appellate court then rejected Freshwater's contentions that there was not sufficient evidence to sustain the board's termination decision and that additional hearings were necessary.

**{¶ 73}** The Fifth District next rejected Freshwater's contention that "the conduct found did not rise to the level of good and just cause sufficient to terminate his contract." *Id*. at ¶ 26. The appellate court stated that in *Hale v. Lancaster Bd. of Edn.*, 13 Ohio St.2d at 99, 234 N.E.2d 583, "good and just cause" is defined as a "fairly serious matter," and observed that the referee found that Freshwater's " 'repeated violation of the Constitution of the United States' " and his repeated acts " 'in defiance of direct instructions and orders of the administrators—his superiors' "—both constituted a "fairly serious matter." *Id.* at ¶ 27, quoting the referee's report.

**{¶ 74}** The court of appeals noted that "a hearing spanning nearly two years was conducted, testimony from over 80 witnesses was received, a transcript of over 6,000 pages was produced, and approximately 350 exhibits were admitted into evidence." *Id.* at ¶ 31. It further noted that Freshwater "was represented by a

competent attorney, he was permitted to fully explain his actions, he presented witnesses on his behalf, and he had a full opportunity to challenge the Board's key witnesses." *Id.* at ¶ 32. The Fifth District concluded that the trial court did not abuse its discretion by rejecting Freshwater's requests for additional hearings and that the common pleas court's decision to affirm the termination was not an abuse of discretion. *Id.* at ¶ 33-34. Therefore, the appellate court overruled Freshwater's sole assignment of error. *Id.* at ¶ 36.

**{¶ 75}** We accepted Freshwater's discretionary appeal, 132 Ohio St.3d 1461, 2012-Ohio-3054, 969 N.E.2d 1230, and now affirm.

## ANALYSIS

### *Standards for Termination of a Teacher's Contract*

**{¶ 76}** Before a board of education can terminate a teacher's contract, it must comply with R.C. 3319.16, which sets forth the procedures for terminating a contract:

[T]he employing board shall furnish the teacher a written notice signed by its treasurer of its intention to consider the termination of the teacher's contract with full specification of the grounds for such consideration. * * * [T]he teacher may file with the treasurer a written demand for a hearing before the board or before a referee * * *. The hearing shall be conducted by a referee appointed pursuant to section 3319.161 of the Revised Code * * * and shall be confined to the grounds given for the termination. * * *

* * * After a hearing by a referee, the referee shall file a report within ten days after the termination of the hearing. * * * After consideration of the referee's report, the board, by a majority vote, may accept or reject the referee's recommendation on the termination of the teacher's contract. After a hearing by the board,

the board, by majority vote, may enter its determination upon its minutes. Any order of termination of a contract shall state the grounds for termination. * * *

Any teacher affected by an order of termination of contract may appeal to the court of common pleas of the county in which the school is located within thirty days after receipt of notice of the entry of such order. * * * The court shall examine the transcript and record of the hearing and shall hold such additional hearings as it considers advisable, at which it may consider other evidence in addition to the transcript and record.

{¶ 77} If a party to an R.C. 3319.16 proceeding, i.e., termination of a teacher's contract, appeals to an appellate court, "[a]bsent an abuse of discretion on the part of the trial court, the court of appeals may not engage in what amounts to a substitution of judgment of the trial court." *Graziano*, 32 Ohio St.3d at 294, 513 N.E.2d 282. "The term 'abuse of discretion' has been defined as implying 'not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.' " *Id*. (Douglas, J., concurring), quoting *State ex rel. Shafer v. Ohio Turnpike Comm.,* 159 Ohio St. 581, 590-591, 113 N.E.2d 14 (1953).

{¶ 78} Here, the board had good and just cause to terminate Freshwater's contract. The court of appeals held: "There was sufficient evidence to support both the referee and [the board's] findings, and we do not determine issues involving credibility." 2012-Ohio-889 at ¶ 24. The appellate court held that it did "not perceive an 'unreasonable, arbitrary or unconscionable attitude,' nor one that is 'not merely error of judgment, but [one of] perversity of will, passion, prejudice, partiality, or moral delinquency.' " *Id*. at ¶ 22.

{¶ 79} Upon careful review, we agree.

### *Display of Religious Materials*

{¶ 80} White's letter to Freshwater made clear that Freshwater, as a public school teacher, could not "engage in any activity that promotes or denigrates a particular religion or religious beliefs while on board property, during any school activity," or when he was teaching. The district simply stated what the law, and the First Amendment, commands.

{¶ 81} Freshwater not only ignored the school district's directive, he defied it. After he was directed to remove the items, Freshwater deliberately added to them, incorporating the *Oxford Bible* and *Jesus of Nazareth* into the classroom. He then refused to remove his personal Bible from his desk, and refused to remove a depiction of former President George W. Bush and Colin Powell and others in prayer from his wall.

{¶ 82} Pursuant to R.C. 3319.16, a public school teacher's contract may not be terminated except for good and just cause. When a teacher has been insubordinate, good and just cause exists for a board of education to terminate that teacher's contract. In the context of teacher-contract-termination cases, the term "insubordination" has been defined to include a willful "disobedience of, or refusal to obey, a reasonable and valid rule, regulation, or order issued by the school board or by an administrative superior." Annotation, *What Constitutes "Insubordination" as Ground for Dismissal of Public School Teacher*, 78 A.L.R.3d 83, 87 (1977).

{¶ 83} This is a succinct definition of the term "insubordination," and we adopt it for our purposes here. We therefore hold that in a proceeding under R.C. 3319.16 for the termination of a public school teacher's contract, "good and just cause" includes insubordination consisting of a willful disobedience of, or refusal to obey, a reasonable and valid rule, regulation, or order issued by a school board or by an administrative superior.

{¶ 84} It is undisputed that Freshwater willfully disobeyed orders when he failed to remove (1) his personal Bible, (2) *Jesus of Nazareth* and the *Oxford Bible*, and (3) the poster of government officials praying. But disobedience alone will not establish insubordination under the definition we adopt above. We must also find that the orders themselves were reasonable and valid. If any order was either unreasonable or invalid, Freshwater's disobedience of it would not be insubordinate.

*Freshwater's personal Bible*

{¶ 85} We begin by considering Principal White's order for Freshwater to remove his personal Bible from his desk. We conclude that this order was neither reasonable nor valid. The order infringed without justification upon conduct protected by the Free Exercise Clause of the First Amendment to the United States Constitution. The district's proffered rationale for the order—that Freshwater's display of his Bible on his desk violated the Establishment Clause—was erroneous, because this Bible presented no such violation.

{¶ 86} Teachers do not abandon their First Amendment rights when they enter their classrooms. *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate"). Included in those First Amendment rights is the ability to freely exercise one's religion. The protections of the Free Exercise Clause apply whenever the government "regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

{¶ 87} Freshwater's conduct in keeping his personal Bible at his desk was plainly undertaken for religious reasons. And the district sought to regulate that conduct solely because the conduct was religiously motivated. Thus, when the district ordered Freshwater to put away his personal Bible, it infringed upon

religious conduct protected by the Free Exercise Clause, something Freshwater has asserted throughout this controversy. *See Hudson v. Palmer*, 468 U.S. 517, 547, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), fn. 13 (Stevens, J., concurring in part and dissenting in part) ("possession of * * * personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause"); *Warnock v. Archer*, 380 F.3d 1076, 1082 (8th Cir.2004) (personal religious effects in school superintendent's office, including Bible, were protected by Free Exercise Clause).

**{¶ 88}** Because the First Amendment protected Freshwater's conduct, we must determine whether the school had a legitimate justification for prohibiting that conduct.[6] The district provided only one reason for why it ordered Freshwater to remove his personal Bible: it wanted to avoid an Establishment Clause violation. The district undeniably has an interest in avoiding Establishment Clause violations, and this interest may even justify infringement on teachers' First Amendment rights. *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Good News Club v. Milford Cent. School*, 533 U.S. 98, 112-113, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). But the interest must be grounded in reality; the district's mere fear of an Establishment Clause violation will not justify burdening First Amendment protections. *See United States v. Natl. Treasury Emps. Union*, 513 U.S. 454, 475, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), quoting *Whitney v. California*, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) (First Amendment restrictions "requir[e] a justification far stronger than mere speculation about serious harms. * * * 'Men feared witches and burnt women' "). If the district was

---

6. The relevant "conduct" here consists solely of Freshwater keeping his personal Bible on his desk. Numerous students testified that Freshwater never held up, read from, or opened his Bible during class. One student alleged that Freshwater once referred to his Bible during class, but HROC investigated this allegation and found no evidence to substantiate it. Many teachers, including Deborah Strouse, who monitored Freshwater's classroom in 2008 when this controversy developed, similarly confirmed that Freshwater never used his personal Bible in class.

acting to avoid an Establishment Clause violation, there actually needed to be an Establishment Clause violation to avoid. *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (rejecting school district's Establishment Clause defense because its "posited fears of an Establishment Clause violation are unfounded"); *Brown v. Polk Cty., Iowa*, 61 F.3d 650, 659 (8th Cir.1995) (baseless fear of Establishment Clause violation could not justify county's order for public employee to remove Bible from his desk).

{¶ 89} In this case, we must reject the district's justification because the inconspicuous presence of Freshwater's personal Bible posed no threat to the Establishment Clause and the record supports that he did not use the Bible while teaching. A public school violates the Establishment Clause if its actions could reasonably be perceived as an official endorsement of religion.[7] *Cty. of Allegheny v. Am. Civ. Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 592-593, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *Santa Fe Indep. School Dist. v. Doe*, 530 U.S. 290, 305-308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 841-842, 115 S.Ct. 2510,

---

7. Traditionally, courts have tested for Establishment Clause violations using the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (government action violates the Establishment Clause if (1) it does not have a secular purpose, (2) its primary effect is to advance or inhibit religion, or (3) it creates an excessive entanglement between government and religion). In recent years, however, the Supreme Court has only intermittently used the *Lemon* test, and whether the test actually applies in any given scenario is difficult to discern. *See, e.g.*, *Utah Hwy. Patrol Assn. v. Am. Atheists, Inc.*, __ U.S. __, 132 S.Ct. 12, 14, 181 L.Ed.2d 379 (2011) (Thomas, J., dissenting from the denial of certiorari) ("Our jurisprudence provides no principled basis by which a lower court could discern whether *Lemon*/endorsement, or some other test, should apply in Establishment Clause cases"). In its most recent cases dealing with the Establishment Clause in public schools, the Supreme Court has declined to apply *Lemon*, instead opting for the endorsement test. *See Good News Club*, 533 U.S. at 113, 115, 121 S.Ct. 2093, 150 L.Ed.2d 151; *Santa Fe Indep. School Dist. v. Doe,* 530 U.S. 290, 308-309, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 841-842, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Even if we were to apply *Lemon* in this case, we would find no Establishment Clause violation. Simply allowing a teacher to keep his personal Bible on his desk would not have a religious purpose, would not advance religion, and would not excessively entangle government with religion.

132 L.Ed.2d 700 (1995). Endorsement occurs when the government " 'convey[s] or attempt[s] to convey a message that religion or a particular religious belief is *favored* or *preferred*.' " (Emphasis sic.) *Cty. of Allegheny* at 593, quoting *Wallace v. Jaffree*, 472 U.S. 38, 70, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in judgment). Endorsement connotes " 'promotion' or 'favoritism.' " *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 764, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).

{¶ 90} The district does not convey a message that it endorses or promotes Christianity by simply allowing Freshwater to keep a personal Bible on his desk. *Bd. of Edn. of Westside Community Schools v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) ("schools do not endorse everything they fail to censor"); *see also Helland v. S. Bend Community School Corp.*, 93 F.3d 327, 331 (7th Cir.1996) (in Establishment Clause challenge, school's concern was with teacher reading Bible aloud to students, not with teacher merely carrying Bible with him). "Merely employing an individual * * * who unobtrusively displays [his] religious adherence is not tantamount to government endorsement of that religion * * *." *Nichol v. ARIN Intermediate Unit 28*, 268 F.Supp.2d 536, 554 (W.D.Pa.2003) (policy prohibiting elementary school teachers and employees from wearing religious jewelry deemed offensive to Free Exercise Clause); *see also Draper v. Logan Cty. Pub. Library*, 403 F.Supp.2d 608, 621 (W.D.Ky.2005) (permitting public library employee to have "unobtrusive displays of religious adherence * * * could not be interpreted by a reasonable observer as governmental endorsement of religion"). Allowing teachers to have personal religious items conveys a message of accommodation, not endorsement. *See Nichols v. Caroline Cty. Bd. of Edn.*, D.Md. No. JFM-02-3523, 2004 WL 350337, at *12 (Feb. 23, 2004), fn. 15 (allowing teacher to keep personal Bible by his desk was an accommodation of teacher's religious expression).

**{¶ 91}** The scene of Freshwater's classroom and the particular physical setting of his Bible—key factors to our endorsement inquiry—further demonstrate the impossibility of any perceived state endorsement of religion. *See Cty. of Allegheny*, 492 U.S. at 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (highlighting importance of context and physical setting in endorsement test). Freshwater kept his Bible at his desk. Teachers at Mount Vernon considered their desks to be personal space. The desk area was off-limits to students, and teachers often kept private items there. Freshwater had even posted a large "KEEP OUT" sign on the side of his desk. The personal nature of the space makes it unlikely that a reasonable observer would perceive official state endorsement of private items placed there.

**{¶ 92}** In addition to being on a personal workspace, rather than in a public, student-accessible area, Freshwater's Bible was inconspicuous. It lay flat on his desk, amongst electronics, texts, office supplies, and other papers. Oftentimes, the Bible was buried under other materials. Teachers testified that there was "stuff all over his desk, so you couldn't hardly see [the Bible]" and that it was "hard to find on his messy desk." Many students never even noticed the Bible or only realized it was in the classroom after it became a highlight of this controversy. HROC concluded that the Bible was not on display; it was neither prominently staged nor placed in a way that would draw any particular attention to it. Other witnesses testified that Freshwater himself never drew any attention to the Bible. Given this unobtrusive, obscured, personal setting, no reasonable observer would assume that the state intended to promote or endorse Freshwater's Bible. *See, e.g.*, *ARIN Intermediate*, 268 F.Supp.2d at 554 ("unobtrusiv[e] displays [of] religious adherence" by school employees do not imply government endorsement of religion and do not violate Establishment Clause).

**{¶ 93}** Finally, we consider that the district has the power to correct any misperceptions it anticipates. As the Supreme Court has stated, a school district's

31

"fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students." *Westside Community Schools*, 496 U.S. at 251, 110 S.Ct. 2356, 110 L.Ed.2d 191. If the school does not want people to think that it promotes Freshwater's beliefs, it can tell them so. *Id.*; *see also Capitol Square*, 515 U.S. at 769, 115 S.Ct. 2440, 132 L.Ed.2d 650 ("If Ohio is concerned about misperceptions, nothing prevents it from requiring all private displays * * * to be identified as such").

{¶ 94} The Free Exercise Clause protected Freshwater's conduct as to his personal Bible. When the district asked Freshwater to remove his Bible from his desk, it was not asking him to cease a meaningless activity. It was demanding that he give up his constitutionally guaranteed rights. The government can encroach upon constitutional rights, but it must have a legitimate reason for doing so. Here, the district's reason was not legitimate. The district feared an Establishment Clause violation where none existed. Unsubstantiated fear alone cannot justify flouting the First Amendment.

{¶ 95} We therefore conclude that the district's order for Freshwater to remove his personal Bible from his desk was neither reasonable nor valid; the order infringed on Freshwater's free-exercise rights without justification. Because this particular order was invalid, Freshwater's disobedience of the order cannot be considered insubordination or grounds for his termination.

*The remaining orders*

{¶ 96} Freshwater's refusal to remove the other items from his classroom—the *Oxford Bible*, *Jesus of Nazareth*, and the George W. Bush/Colin Powell poster—presents a much simpler issue. Freshwater's First Amendment rights did not protect the display of these items, because they were not a part of his exercise of his religion. Freshwater admitted that he checked out the additional books only in order to make a point once this controversy began. Thus, the district would not run afoul of the Free Exercise Clause by ordering

Freshwater to remove these materials; the orders were both reasonable and valid. Freshwater's willful disobedience of these direct orders demonstrates blatant insubordination. That insubordination is established by clear and convincing evidence, and the record fully supports the board's decision to terminate him on these grounds.

### *Teaching of Creationism and Intelligent Design*
### *Alongside Evolution Generally Disfavored*

**{¶ 97}** We recognize that this case is driven by a far more powerful debate over the teaching of creationism and intelligent design alongside evolution. *See, e.g.*, *McLean v. Arkansas Bd. of Edn.*, 529 F.Supp. 1255 (E.D.Ark.1982). Federal courts consistently hold that the teaching of evolution in public schools should not be prohibited, *Epperson v. Arkansas*, 393 U.S. 97, 106-107, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), and have struck as unconstitutional policies and statutes that require public school teachers to devote equal time to teaching both evolution and the Biblical view of creation. *See, e.g., Daniel v. Waters*, 515 F.2d 485 (6th Cir.1975). The United States Supreme Court and at least one other federal court have held that teaching theories of creationism and intelligent design in public schools violates the Establishment Clause because they convey "supernatural causation of the natural world" and therefore are inherently religious concepts. *Kitzmiller v. Dover Area School Dist.*, 400 F.Supp.2d 707, 736 (M.D.Pa.2005); *Edwards v. Aguillard*, 482 U.S. 578, 591-592, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). However, the Supreme Court holds that teaching creationism is not prohibited in public schools as long as it is done "with the clear secular intent of enhancing the effectiveness of science instruction." *Edwards* at 594.

**{¶ 98}** The Supreme Court also cautions that the courts must be "vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools" because

[f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

*Id.* at 583-584, citing *Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 383, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).

{¶ 99} Here, we need not decide whether Freshwater acted with a permissible or impermissible intent because we hold that he was insubordinate, and his termination can be justified on that basis alone. Freshwater is fully entitled to an ardent faith in Jesus Christ and to interpret Biblical passages according to his faith. But he was not entitled to ignore direct, lawful edicts of his superiors while in the workplace.

## CONCLUSION

{¶ 100} For the reasons set forth in this opinion, we affirm the judgment of the court of appeals that upheld Freshwater's termination.

Judgment affirmed.

FRENCH and O'NEILL, JJ., concur.

LANZINGER, J., concurs in syllabus and judgment.

PFEIFER, O'DONNELL, and KENNEDY, JJ., dissent.

_____

**LANZINGER, J., concurring in syllabus and judgment.**

{¶ 101} With respect to this case involving science students in a public middle school, I would hold that the school district's order that John Freshwater put away his personal Bible while students were present was a reasonable and valid attempt to avoid an Establishment Clause violation. That order did not

infringe on Freshwater's free speech rights, for he was not required to remove the Bible from the classroom—merely putting the book into a desk drawer during class time would have sufficed. The lead opinion states that an order to remove religious materials is valid and reasonable but that an order that a personal Bible not be displayed while students are present is not. I do not see the distinction. In my view, Freshwater disobeyed a reasonable order by incorporating the Bible by reference while teaching in his science classes and displaying the book on his desk while students were present. I would hold that this constituted part of his insubordination.

{¶ 102} Because I disagree with the lead opinion's discussion of this point, I join the syllabus and concur in judgment only.

_____

**PFEIFER, J., dissenting.**

I

{¶ 103} To the end, John Freshwater has been a teacher. For more than five years, he has argued that the school board had no right to require him to remove his Bible from his desk. Five years of hearings and appeals have passed, over $900,000 in legal fees reportedly were expended by the school board on the hearing alone in its quest to fire its best eighth-grade science teacher, and the only holding of consequence by this court today echoes what John Freshwater told a gathering of supporters in Mount Vernon's town square on April 16, 2008:

> Because the Bible is * * * personal and private property and the source of personal inner strength in my own life, the removal of it from my desk would be nothing short of infringement on my own deeply held personal religious beliefs, granted by God and guaranteed under the Free Exercise Clause of the First Amendment in the United States Constitution.

{¶ 104} This court has determined today that Freshwater was right. The central piece of the insubordination claim against Freshwater—that he refused to remove his Bible from his desk—has been determined by this court (by the three members of the court that concur in the lead opinion and by at least one other justice, myself) to be an invalid cause for discipline.

{¶ 105} What next? With the insubordination claim gutted, the lead opinion should have moved on to consider the constitutional issues remaining in the case. Instead, the majority walks away from the opportunity to provide helpful guidance to every school board in Ohio and to the thousands of great teachers who could benefit from knowing more about the extent of and limits on their academic freedom. Justice O'Donnell's well-reasoned dissent addresses the issue, but goes unrebutted. In short, the majority shrinks from the chance to be a Supreme Court. The lead opinion cobbles together the piddling other claims of supposed insubordination, and, sitting as Supreme School Board, the majority declares the matter closed. In a case bounding with arrogance and cowardice, the lead opinion fits right in.

### The Desk Bible Was the Center of the Insubordination Claim

{¶ 106} Since Freshwater became aware of possible discipline, the presence of the Bible on his desk was a bone of contention. The April 7, 2008 letter from Principal William White to Freshwater was to follow up with Freshwater regarding concerns about Freshwater's role with the Fellowship of Christian Athletes ("FCA") and about "religious materials in [his] classroom." The letter mentioned only the Bible on his desk and the Ten Commandments on Freshwater's classroom window as potentially offensive:

> With regard to religious materials in your classroom, it has been brought to my attention that you have a bible out on your

desk and that the "collage" on your classroom window includes the 10 commandments. While you certainly may read your bible on your own, duty free time [i.e. during lunch], it cannot be sitting out on your desk when students are in the classroom and when you are supposed to be engaged in your responsibilities as a teacher. As for the 10 commandments, that part of your collage must be taken down and replaced with something that is not religious in nature.

{¶ 107} A letter from White to Freshwater on April 14—before Freshwater had checked out books from the library—memorializes an April 11 conversation between White and Freshwater regarding religious items in Freshwater's classroom:

As per our conversation, all religious items need to be removed from your classroom by the end of the day on Wednesday, April 16, 2008. Bibles and other religious DVD's, videos, etc. should be placed out of sight and access of students by this date.

{¶ 108} In the letter from their attorneys dated April 14, 2008, Stephen and Jenifer Dennis, the parents of Zach Dennis, the now adult who was the eighth-grade student at the heart of this case, outlined their own bill of particulars stating why Freshwater's career must end:

The Ten Commandments are displayed in Mr. Freshwater's classroom. Several Bibles are also kept in Mr. Freshwater's classroom and are there as a display to his students, not for his personal use. This display represents an ostensible and

predominant purpose of advancing religion and violates the central Establishment Clause virtue of official religious neutrality.

{¶ 109} In a letter from their attorney to Superintendent Stephen Short dated April 21, 2008, the hypervigilant Dennises apparently were satisfied that the religious-display issue had been cleared up, and moved on to other matters: "While we appreciate Mt. Vernon's efforts to have Mr. Freshwater remove religious materials from his classroom, it is obvious that Mr. Freshwater has not ceased his religious teachings."

{¶ 110} On April 16, 2008, Freshwater and White came to a crystal clear understanding: If Freshwater did not remove his personal Bible from his desk in his classroom, he would be considered insubordinate. That conclusion was specific and undeniable. Only one thing was necessary for Freshwater to be found insubordinate—that his personal Bible remain on his desk. Freshwater could not abide any directive to remove it. He so fervently believed his rectitude that he went public, literally entering the public square to air his grievance.

{¶ 111} In a story in the April 18, 2008 *Mansfield News Journal* entered into evidence by Freshwater, Mount Vernon School Board president Ian Watson spoke about insubordination, mentioning only Freshwater's Bible:

> "If he doesn't remove the Bible from his desktop, at some point, and I don't know that point yet because we haven't progressed that far, but some claim of insubordination could be made," Watson said. "There would be penalties involved, which would vary depending on the level of insubordination."

Kinton, *Mount Vernon School Officials Hope to Resolve Bible Standoff Quickly*, Mansfield News Journal (April 18, 2008). The same article later recounted additional details:

> Watson said the Bible on Freshwater's desk became an issue when one family brought it to Short's attention.
>
> "The parents expressed concern on what allegedly occurred. Most recently, I spoke to the family at the first of this month," Watson said. "We would like to see the Bible removed so that we can be responsive to parents, and we would like to reach a common ground with Mr. Freshwater that everyone can be OK with, but I don't know if that will happen."

**{¶ 112}** Over and over again, the Ten Commandments and Freshwater's personal Bible were the focus of the complaints against Freshwater. There is no dispute that the Ten Commandments were quickly removed from his classroom. The Bible remained the sticking point.

### *Other Evidence of Insubordination*

**{¶ 113}** The issue of Freshwater's desktop Bible deserves the attention the lead opinion gives it. The presence of that Bible on his desk was at the very center of the insubordination claim against Freshwater. Now that theory is gone, and less than a fig leaf remains. The lead opinion spends many paragraphs explaining the invalidity of the central reason given for Freshwater's dismissal, his refusal to remove his Bible from his desk. An unofficial majority of the court agrees with that aspect of the holding, as I consider myself a member of that unofficial majority. But the lead opinion spends just one scant, conclusory paragraph outlining why Freshwater's career had to end. Now that Freshwater

has won on the most important dispute, the myth must be created that the presence of the other items constituted insubordination.

*Bush/Powell Poster*

**{¶ 114}** Was there a valid work rule in effect regarding the Bush/Powell poster? The majority cannot be bothered to say whether there was or whether it was willfully disobeyed. Certainly, if there were a rule about the Bush/Powell poster, it did not apply to everyone. As Justice O'Donnell relates in his dissenting opinion, at ¶ 147, the poster was distributed by the school and was displayed in other teachers' rooms. The picture of the poster in evidence shows that the biblical quote at the top of the poster is largely obscured by other items on Freshwater's bulletin board. There is no evidence that Freshwater left the Powell/Bush poster up because of its religious nature. He claimed that it was a patriotic poster that appealed to him because he had two children in the military. The president of the school board, Watson, testified that "in and of itself," the poster was not a religious display. And on April 16, the poster was inconsequential—Freshwater was told he would be insubordinate for failing to remove his Bible. The poster was then what it is today: a trifle.

*Library Books*

**{¶ 115}** What work rule or order did Freshwater violate by checking out books from the library? Was there a work rule in effect that a teacher could not borrow books from the school library and keep them in his work area? Does the lead opinion really mean to say that books of a religious nature are acceptable in the library but not acceptable to be checked out from the library? Or is it only practicing Christians who cannot borrow such books from the library? Freshwater is not accused of reading to his class from the books or assigning the books to his students. They were school property and could have been removed at any time. There is no documented complaint about the books and no specific order that they be removed.

{¶ 116} Whether Freshwater checked them out of the library to make a point or to provide himself comfort is irrelevant. There was no work rule or order that he could not have them in his classroom. If he did check them out to make a point, the point was valid: religious materials were present in the school and if they were not forced upon children, possessing them was acceptable. If the placement of the library books, the *Oxford Bible* and *Jesus of Nazareth,* was designed to demonstrate defiance, should Freshwater be fired for indicating his resistance to a policy that this court has declared illegal?

### *A Fairly Serious Matter*

{¶ 117} In interpreting the "other good and just cause" clause of the version of R.C. 3319.16 at issue here, this court has made clear that firings implicating that phrase must involve conduct on a par with that justifying termination for other reasons under the statute:

> In construing the words, "other good and just cause," we note that they are used with the words "gross inefficiency or immorality" and "willful and persistent violations" of board regulations. In our opinion, this indicates a legislative intention that the "other good and just cause" be a fairly serious matter.

*Hale v. Lancaster Bd. of Edn.*, 13 Ohio St.2d 92, 98-99, 234 N.E.2d 583 (1968).

{¶ 118} Is the presence of this poster and a couple of library books in his classroom a serious matter on a par with "gross inefficiency or immorality" or "willful and persistent violations" of board regulations? Is this enough to end a career of over 20 years?

{¶ 119} Freshwater's activities do not sink to the level of other school employees terminated pursuant to R.C. 3319.16. Should Freshwater join the likes of the assistant superintendent in *Kitchen v. Bd. of Edn. of Fairfield City School*

*Dist.*, 12th Dist. Butler No. CA2006-09-234, 2007-Ohio-2846, who was fired because of an arrest for drunken driving and her failure to alert her superior about it; the teacher in *Oleske v. Hilliard City School Dist. Bd. of Edn.*, 146 Ohio App.3d 57, 764 N.E.2d 1110 (10th Dist.2001), who was dismissed for telling jokes of a sexual nature to certain of her middle-school students and mocking another teacher in vulgar terms; and the high school teacher in *Elsass v. St. Marys City School Dist. Bd. of Edn.*, 3d Dist. Auglaize No. 2-10-30, 2011-Ohio-1870, who was terminated for masturbating in a school parking lot during a school event?

{¶ 120} The court in *Bertolini v. Whitehall City School Dist. Bd. of Edn.*, 139 Ohio App.3d 595, 744 N.E.2d 1245 (10th Dist.2000), reviewed the types of cases meriting R.C. 3316.19 termination:

> A review of cases in which the appellate court affirmed a school board's decision to terminate a school employee shows that the teacher's behavior had or could have had a serious effect on the school system. For example, many of the cases involved inappropriate sexual relations between faculty and students. Other cases involved instances in which a teacher had been convicted of a serious criminal offense. Some of the cases involved direct refusals by teachers to follow board guidelines. In other cases, the actions of a teacher could have caused serious harm to a student.

(Footnotes omitted.) *Id*. at 608.

{¶ 121} *Bertolini* discussed, in particular, cases involving direct refusals by teachers to follow board guidelines:

42

In *Buie* [*v. Chippewa Local School Dist. Bd. of Edn.*, 9th Dist. Wayne No. 2924, 1995 WL 542217 (Sept. 13, 1995)], the teacher resisted making any changes suggested by the school principal over a two-year period to alleviate excessive noise and disorder in his classroom. In *Wynne v. S. Point Local School Dist. Bd. of Edn.* (July 23, 1992), [4th Dist.] Lawrence App. No. 91CA15, unreported, 1992 WL 174720, a teacher failed to report to work at the expiration of her leave of absence after having been absent from work for twenty months. In *Swinderman v. Dover City School Dist. Bd. of Edn.* (Apr. 20, 1992), [5th Dist.] Tuscarawas App. No. 91AP110092, unreported, 1992 WL 91655 * * *, a teacher lied about time taken for sick leave following a trip during Christmas break to Arizona with a student. In *Thomas v. Columbus Pub. Schools* (Feb. 12, 1991), [10th Dist.] Franklin App. No. 90AP-649, unreported, 1991 WL 19301, the teacher refused to follow a program established by the board and refused to cooperate to the point that the teacher threw a consultant out of his classroom.

*Id.* at fn. 4.

{¶ 122} The remaining instances of so-called insubordination in this case involve no program or official policy of the board of education. Neither the Bush/Powell poster nor the library books had a serious effect on the school system. At worst, they were de minimis violations of an unwritten, ad hoc rule.

{¶ 123} This court's decision will have far-reaching consequences. In its effort to be rid of Freshwater's case without too much heavy lifting, this court has set a very low bar for what constitutes "good and just cause." Precedent from this court regarding R.C. 3319.16 is fairly limited, but now we have a case on the

books setting forth that good and just cause means very little cause at all. Teachers throughout the state should feel much less secure in their employment today.

II

**{¶ 124}** This case illustrates the importance of leadership and the power of hysteria. This case should be a cautionary tale for other school boards, a case study of what not to do. For at least a month before the situation exploded, the Dennises had been complaining about Freshwater, often to the school-board president, Watson, who was a personal acquaintance of Stephen Dennis. Based on those complaints, Freshwater was admonished by a letter dated April 7, 2008, to abide by rules regarding his participation in FCA events and to remove religious displays in his classroom. The situation cried out for leadership by the superintendent, a school-board member, or a prominent community member to bring the sides together and work together toward some understanding. Indeed, a meeting was arranged between the Dennises and Freshwater. The Dennises, however, wished to remain anonymous so that if they canceled the meeting, Freshwater would not know who had lodged complaints against him. According to the Dennises, this was done to protect their son from retaliation. Near the time of the meeting, White revealed to Freshwater the name of the complainant, which upset the Dennises. They canceled the meeting because, according to Mr. Dennis, Freshwater was going to have representation at the meeting and the Dennises were not. Soon enough, the Dennises obtained representation. Within a week, their counsel was demanding Freshwater's removal from the classroom. Fire him or face a lawsuit, the Dennises said. Bullies are not relegated to playgrounds.

**{¶ 125}** On April 16, Freshwater made his appearance on the square in Mt. Vernon. The Board of Education responded with a press release announcing many of the claims that the Dennises had raised against Freshwater. And then the headlines started. One headline, accompanied by an article on page A1 of the

*Columbus Dispatch* on April 23, 2008, proclaimed: "DISPUTE WITH MOUNT VERNON TEACHER; Religious 'healing,' branding charged." The circus came to Mount Vernon.

{¶ 126} Hurriedly, an investigation was started. Counsel was retained by the school. Counsel then retained a "mom and pop" human-resources investigation firm, which used a tiny rear-view mirror to review a man's 20-year career. Hired to find evidence to fire Freshwater, the investigator did just that. Based on the report (the board's lawyer reviewed earlier drafts), the board announced its intention to fire Freshwater.

{¶ 127} Meanwhile, the Dennises, deciding that the end of Freshwater's career was insufficient, filed suit in federal court. That Tesla-coil mark on poor Zach's arm—the one Freshwater claimed was an X and they claimed was a cross—started looking an awful lot like a dollar sign. Eventually, the suit against Freshwater would be settled for $475,000, which included $300,000 for the Dennis parents, $25,000 for their lawyer, and a $150,000 annuity that will end up paying Zach around $217,000 by the time he is 30. The suit against the school district settled for less: in that case, each parent received $1, Zach $5,500, and their lawyers $115,500. Money was a wonderful salve for Zach's injured arm, which, after all, had suffered a mark on it that disappeared in three weeks. It had kept him from sleeping for a few minutes the night it happened. But now, all is well. His mother, Jenifer, was quoted in a magazine article, Boston, *Insidious Design*: *At the Ohio Supreme Court, a Teacher Claims an "Academic Freedom" Right to Push Creationism in Public School*, Church & State (Nov. 2012) 4, available at https://www.au.org/church-state/november-2012-church-state/featured/insidious-design (accessed Nov. 4, 2013), in 2012:

"Although Mount Vernon has many positive attributes and we still spend time there," Jenifer Dennis said, "we are extremely

fortunate to have found a warm and welcoming community in an adjacent county that we've now become a part of. It is a community that is accepting of all ideas, thoughts and people from all walks of life and our family is now a part of it, so we haven't thought about moving back to Mount Vernon."

{¶ 128} How special.

{¶ 129} R. Lee Shepherd was hired to conduct the hearing Freshwater demanded; Freshwater had preferred that the board hear it directly, but that request was denied. And so Shepherd conducted the hearing sporadically for two years, taking evidence. On January 7, 2011, he announced his findings. He concluded that none of the grounds individually was enough to cause Freshwater's ouster: "It is not herein determined whether any one of the bases/grounds for consideration of termination would be sufficient in and of itself. However, the multiple incidents which give rise to the numerous and various bases/grounds more than suffice in support of termination."

{¶ 130} Despite relying on only one ground for Freshwater's termination, the lead opinion does not suffer from Shepherd's finding that only a combination of grounds could lead to his termination, because the school board's resolution slickly states that each action, whether individually or jointly, constituted good and just cause for termination.

{¶ 131} Shepherd concluded that "Freshwater refused and/or failed to employ objectivity in his instruction of a variety of science subjects and, in so doing, endorsed a particular religious doctrine. By this course of conduct John Freshwater repeatedly violated the Establishment Clause."

{¶ 132} This conclusion of constitutional significance has gone unexamined by every reviewing court. Each reviewing court has instead remarked how very, very large the record is. Judge Eyster's two-page rubber

stamp of the termination noted that "[t]he referee presided over thirty-eight (38) days of witness testimony from over eighty (80) witnesses generating six thousand three hundred forty four (6,344) pages of transcript. The Referee also admitted approximately three hundred fifty (350) exhibits into evidence." What followed in the trial court's entry was exactly zero (0) analysis of the referee's report upon which the board based its termination resolution.

{¶ 133} The appellate court stated that "[a] review of the record shows that a hearing spanning nearly two years was conducted, testimony from over 80 witnesses was received, a transcript of over 6,000 pages was produced, and approximately 350 exhibits were admitted into evidence." 2012-Ohio-889 at ¶ 31. The appellate court found merely that the trial court had not abused its discretion in affirming the board. *Id.* at ¶ 34.

{¶ 134} Here, the lead opinion, at ¶ 9, adds, "After the hearing, which involved 38 different days of witness testimony spread out over almost 21 months, included more than 80 witnesses and hundreds of exhibits, and ultimately resulted in over 6,000 pages of transcript, the referee issued a report on January 7, 2011." With a record that large, how could an R.C. 3319.16 referee be wrong about the Establishment Clause?

{¶ 135} How many of those 38 different days were wasted, how many of those 80 witnesses were ultimately unnecessary? The 6,000 pages of transcript were at least 60 times too many. For the lead opinion, all that was necessary to fire Freshwater was proof that he had checked out library books and put them in his classroom, a classroom that contained a poster that might be considered religious.

{¶ 136} Thus concludes the sorry saga of John Freshwater, excellent junior-high science teacher, terminated as a result of an extreme overreaction of the parents of a decent student, followed by even less informed and measured responses by Mount Vernon school administrators and the school board. The

Mount Vernon school board and school administration are the nominal winners of this case, but they have managed to divide a really nice community and cost the school board and/or its insurance providers well over a million dollars to free itself of a very good teacher. And the people they did it for left town.

{¶ 137} There is a clear set of winners today: the lawyers who advised a high-dollar settlement of a good case that would have proved valueless to the plaintiff parents and student if taken to trial and those who advised the Mount Vernon school board to pursue a very bad case against John Freshwater to a hollow but expensive victory in the Ohio Supreme Court. They have told themselves that they are participating in the evolved version of the *Scopes* trial, when in reality they have created a modern *Jarndyce and Jarndyce*.

{¶ 138} John Freshwater will be deemed today's loser by superficial press accounts. He has lost his job, reportedly mortgaged his home to cover his litigation expenses, and will receive no compensation whatsoever. But John Freshwater is not today's big loser, because he fought to prove that he actually followed the rules, that he taught well, and that over a lifetime of dedication to the students in his classrooms he made a positive contribution to their lives. That proof is uncontroverted. In that most important measure of public education, John Freshwater is a winner and his final departure is a loss to the Mount Vernon schools.

{¶ 139} This court accepted jurisdiction in this case presumably to speak to the important issues of the Establishment Clause, academic freedom, and how schools may approach educating children about the scientific theories of evolution, which may directly clash with religious teachings of creation to which many children have been exposed at home and at church. Instead this court sidesteps all of the difficult issues presented in the case leaving the resolution of all these heady matters in the hands of a lone referee. Ironically, the lead opinion

in this case proves the existence of God. Apparently, he's an R.C. 3319.16 referee from Shelby.

———————————

**O'DONNELL, J., dissenting.**

{¶ 140} The right of free speech of public school teachers and their students and the freedom of a public school teacher to select and utilize teaching materials and methods to effectively present the prescribed school curriculum are the core issues in this case. It involves a veteran science teacher singled out by the Mount Vernon City School District Board of Education because of his willingness to challenge students in his science classes to think critically about evolutionary theory and to permit them to discuss intelligent design and to debate creationism in connection with the presentation of the prescribed curriculum on evolution. It is not about marking a cross on a student's arm with a Tesla coil, nor, as viewed by the majority, a simple case of teacher insubordination. We accepted jurisdiction on two propositions of law, which present issues of constitutional magnitude:

> [I] The termination of a public school teacher's employment contract based on the teacher's use of academic freedom where the school board has not provided any clear indication as to the kinds of materials or teaching methods which are unacceptable cannot be legally justified, as it constitutes an impermissible violation of the rights of the teacher and his students to free speech and academic freedom under the First Amendment to the United States Constitution and a manifestation of hostility toward religion in violation of the First Amendment's Establishment Clause.

[II] The termination of a public school teacher's employment contract based on the mere presence of religious texts from the school's library and/or the display of a patriotic poster cannot be legally justified, as it constitutes an impermissible violation of the rights of a teacher and his students to free speech and academic freedom under the First Amendment to the United States Constitution and a manifestation of hostility toward religion in violation of the First Amendment's Establishment Clause.

Because the majority resolves this case by finding that sufficient evidence exists to support just cause for termination and fails to examine the constitutional issues, I respectfully dissent.

## Insubordination

{¶ 141} John Freshwater served with distinction as a teacher in the Mount Vernon City School District for more than 20 years. Prior to his termination by the board of education, he had received overwhelmingly positive performance reviews and, as acknowledged in the referee's report issued after a protracted hearing in this matter, he had been "recognized by his peers for his outstanding teaching skills." In addition, the record reflects, he had never been subject to any formal discipline by school administrators.

{¶ 142} In December 2007, one of his students, Z.D., complained about the use of a Tesla coil that marked his arm with what appeared to be an "X" or a cross. After Z.D.'s parents complained, William White, the school principal, resolved the matter by instructing Freshwater not to use the Tesla coil on students and to secure it when not in use. That directive, however, did not satisfy the student's parents, and in April 2008, through counsel in a letter to district Superintendent Stephen Short, they threatened to sue the board of education if it did not order Freshwater to remove Bibles and religious displays from the

classroom by April 18, 2008, and if it did not suspend him from teaching pending an investigation.

{¶ 143} In an apparent response to the threatened litigation, White instructed Freshwater by letter that "all religious items need to be removed from your classroom by the end of the day on Wednesday, April 16, 2008. Bibles and other religious DVD's, videos, etc. should also be placed out of sight and access of the students by this date." Despite the fact that he had been singled out and that other teachers and administrators had Bible verses or other religious references on display in their rooms, Freshwater removed copies of the Ten Commandments from the walls in his classroom, together with at least ten inspirational posters containing Bible verses, various religious DVDs and videos, and boxes of Bibles used by the Fellowship of Christian Athletes, a school-sanctioned organization that he monitored and allowed to meet in his classroom. The only items that remained at the end of the day on April 16 were his personal Bible, a religious book and a Bible from the school's library, and a poster of President George W. Bush and his cabinet captioned, "The effectual fervent prayer of a righteous man availeth much," James 5:16, which had been distributed by the school and which other teachers and colleagues displayed in their classrooms and offices at the school.

{¶ 144} The board concluded that by having his personal Bible, the school library books, and the school-issued poster in his classroom, Freshwater "acted in defiance of direct instructions and orders of the administrators." The board then stated, "Freshwater was directed to remove or discontinue the display of all religious articles in his classroom, including all posters of a religious nature, and * * * has failed to comply with that directive and, further, has brought additional religious articles into his classroom, in a direct act of insubordination." That finding is wrong and is not supported by the record. Notably, White's letter did not instruct Freshwater to remove all religious articles from his classroom, as the

board stated.  The principal testified that he told Freshwater that "certainly he may read his Bible during his own time, but during the times that students were in the classroom it was supposed to be, you know, out of sight and put away from the students."  White also informed Freshwater that "other religious DVD's, videos, etc. should also be placed out of sight and access of the students."  Lacking in the record is any indication that any students were present in the classroom when White inspected it on April 16 or that students had access to them.  The conclusion that Freshwater defiantly violated the directive is subjective— especially because Freshwater had permission to read his own Bible and the two other books in his classroom came from the school's own library.

{¶ 145} The lead opinion recognizes that Freshwater had a constitutional right to keep his Bible on his desk and that he was not insubordinate for doing so and could not be terminated on that basis, yet it concludes that he had no First Amendment right to have the copies of the *Oxford Bible* or *Jesus of Nazareth* from the school library in his classroom, because these books were not a part of his personal religious exercise.  But this is a specious argument and a distinction without a difference. The conclusory statement in the lead opinion that Freshwater was defiant because he had these library books in his classroom is unwarranted. He explained that at the time he checked these books out, he "was expecting my Bible to be removed out of my classroom. And my daughter and I would walk in—my daughter would always open it up and say, Dad, it's still there, Dad, it's still there.  That's my inspiration.  I'm not going to go without my inspiration." He testified that he checked these books out of the library for two reasons:

> [O]ne, I was curious about if the library had them.  I wanted to
> look at them.  And I found some interesting information.
>       Q. Okay.

52

A. So it was a curiosity. Two, it's my inspiration. I thought that someday, after the 16th and on, that my Bible would be removed out of my classroom, so I would have the *Oxford* [*Bible*] from the school library there. And my thinking was they're not going to remove the school library Bible.

* * *

* * * My point would be, again, inspirational. I want to have a Bible on my desk. They're not going to take the school library Bible off my desk. That was my thinking at the time.

**{¶ 146}** Thus, his purpose for having the school Bible on a lab table in his classroom had nothing to do with being defiant or insubordinate. As an individual who read his Bible during his personal time for inspiration and moral growth, he did not want to be deprived of that opportunity if the school authorities confiscated his personal Bible. The school board could not constitutionally preclude Freshwater from seeking religious inspiration from the school library's *Oxford Bible* or its book *Jesus of Nazareth*. Rather, the analysis articulated by the lead opinion in holding that Freshwater had a First Amendment right to have his personal copy of a Bible at his desk also applies to the books he withdrew from the school library, because his purpose for doing so is protected by the Free Exercise Clause of the First Amendment. The presence of these school library books in the classroom cannot reasonably be viewed as an official endorsement of religion, because they are the school's own books, and thus does not justify the school board's action that encroached on Freshwater's constitutional right to personal religious exercise, let alone justify discharging him for insubordination because he had them in the classroom.

**{¶ 147}** Nor did Freshwater have any reason to believe that he had to remove the poster of President Bush and his cabinet, because he considered it to

inspire patriotism, not religion, and it had been provided to him by the school. In addition, other members of the faculty had the same poster on display in their classrooms and offices—including Dino D'Ettore, Ben Sanders, David Carter, Brian Gastin, and Timothy Keib—apparently none of whom had been ordered to remove it from display. Carter kept the poster in his office long after the board resolved to terminate Freshwater for not removing it. And faculty members testified that in their view, the poster was not a religious display. Seventh grade teacher Lori Miller thought, "[W]hat an awesome poster to see men that are—that have so much power having a moment of humbleness or weakness or—you know, I just thought that was great for—especially for middle school kids to see powerful men kind of taking a time out." Former interim principal Timothy Keib called the poster "non-religious"; former middle school principal Jeff Kuntz "didn't look at it as a religious poster"; and intervention specialist Andrew Thompson saw it as depicting "the leader of the country and not necessarily religious connections."

{¶ 148} Thus, based on this and other evidence, Freshwater did not act in defiance of instructions and orders of school administrators when he failed to remove his personal Bible, school library books, or the poster of President Bush and his cabinet that the school had provided him. The conclusion that Freshwater was insubordinate for failing to remove these items is not supported by the evidence, which demonstrates that the school board singled him out to avoid defending itself against a threatened lawsuit. This is not a valid basis to terminate the teaching contract of a veteran science teacher with skill and talent whose students demonstrated their level of curriculum comprehension by their scores on the Ohio Achievement Test.

## Academic Freedom

{¶ 149} The remaining cause asserted for terminating Freshwater is that he "injected his personal religious beliefs into his plan and pattern of instructing his

students" by exceeding the bounds of all pertinent bylaws and policies of the Mount Vernon City School District. The board referenced Freshwater's instruction on evolution as injecting Christian religious principles of creationism and intelligent design.

{¶ 150} Notably, the referee in this case rejected any claim that Freshwater failed to teach any material, including evolution, as required by the Academic Content Standards, and the referee found that Freshwater's students met or exceeded the expectations for eighth grade science students regarding such mandatory subject areas.

{¶ 151} And the Bylaws and Policies of the Mount Vernon City School District provide:

The Board of Education believes that the consideration of controversial issues has a legitimate place in the instructional program of the schools.

Properly introduced and conducted, the consideration of such issues can help students learn to identify important issues, explore fully and fairly all sides of an issue, weigh carefully the values and factors involved, and develop techniques for formulating and evaluating positions.

For purposes of this policy, a controversial issue is a topic on which opposing points of view have been promulgated by responsible opinion.

The Board will permit the introduction and proper educational use of controversial issues provided that their use in the instructional program:

A. is related to the instructional goals of the course of study and level of maturity of the students;

B. does not tend to indoctrinate or persuade students to a particular point of view;

C. encourages open-mindedness and is conducted in a spirit of scholarly inquiry.

Controversial issues related to the program may be initiated by the students themselves provided they are presented in the ordinary course of classroom instruction and it is not substantially disruptive to the educational setting.

**{¶ 152}** The Academic Content Standards as promulgated by the State Board of Education and the Ohio Department of Education do not provide a script that teachers are required to follow when teaching core requirement subjects. Rather, the Ohio Department of Education explains that in standards-based instruction,

teachers start with the state standards as the basis for classroom instructional planning, rather than starting with a textbook or other classroom materials. Teachers select a unit of instruction that meets the standards, benchmarks and indicators and use the standards to determine how the unit shall be designed, assessed, delivered and evaluated.

Ohio Department of Education, *What Does Standards-Based Instruction Look Like?*, http://ims.ode.state.oh.us/ODE/IMS/Lessons/FAQ/planning_standards_based_instruction_what_does_it_look_like.asp (accessed Sept. 3, 2013). Several teachers at Mount Vernon Middle School testified that they were given "wide latitude" in planning their classes. One teacher explained that this allowed lesson plans to include "[w]hatever * * * would enhance that standard and * * * would

help the students be successful in learning the concept." Thus, Freshwater too enjoyed wide latitude in the realm of academic freedom to teach his classes in the manner he felt most effective and had the discretion to supplement the lessons with handouts and movies.

{¶ 153} Importantly, teachers in public schools have a First Amendment interest in choosing a particular pedagogical method for presenting the material in the official curriculum to students. The United States Supreme Court first recognized the academic freedom of teachers in a series of cases arising from efforts to purge Communists and subversives from college campuses. *See, e.g.*, *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die"); *Barenblatt v. United States*, 360 U.S. 109, 112, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) ("When academic teaching-freedom and its corollary learning-freedom, so essential to the well-being of the Nation, are claimed, this Court will always be on the alert against intrusion by Congress into this constitutionally protected domain").

{¶ 154} In *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), members of the faculty of a state university challenged state laws that disqualified those who advocated the overthrow of government by force, including members of the Communist Party, from teaching. The court held that the laws chilled the exercise of First Amendment rights by not clearly informing teachers what conduct was prescribed, and it stated: "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* at 603. The court emphasized that " '[t]he vigilant protection of

constitutional freedoms is nowhere more vital than in the community of American schools.' " *Id.*, quoting *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

{¶ 155} Although these prior cases dealt with academic freedom in universities and colleges, the court in *Epperson v. Arkansas*, 393 U.S. 97, 107, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), applied this precedent to a state statute that barred school teachers from teaching evolutionary theory. Relying on *Keyishian* in holding the statute unconstitutional, the court explained,

> The State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment. It is much too late to argue that the State may impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees.

{¶ 156} Thus, as the Supreme Court of Colorado observed in *State Bd. for Community Colleges & Occupational Edn. v. Olson*, 687 P.2d 429, 437 (Colo.1984),

> a teacher in a public educational institution has a constitutionally protected First Amendment interest in choosing a particular pedagogical method for presenting the idea-content of a course, as long as the course is part of the official curriculum of the educational institution and the teaching method serves a demonstrable educational purpose.

{¶ 157} The academic freedom of teachers also extends to the teaching of controversial subjects. It is recognized that "teachers at public institutions may not be forced to surrender their rights to speak out on controversial issues as a condition of their employment." 2 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech,* Section 17:32 (2013); *accord Dube v. State Univ. of New York*, 900 F.2d 587, 597 (2d Cir.1990) (explaining that the denial of tenure or promotion in retaliation for controversial teachings viewed by some observers as racist violates the First Amendment). In accord with the principle, the Seventh Circuit Court of Appeals noted in *Zykan v. Warsaw Community School Corp.*, 631 F.2d 1300, 1305-1306 (7th Cir.1980), that local school boards may not place "a flat prohibition on the mention of certain relevant topics in the classroom," forbid "students to take an interest in subjects not directly covered by the regular curriculum," or take actions "guided by an interest in imposing some religious or scientific orthodoxy or a desire to eliminate a particular kind of inquiry generally."

{¶ 158} More recently, in *C.F. ex rel. Farnan v. Capistrano Unified School Dist.*, 654 F.3d 975 (9th Cir.2011), the Ninth Circuit Court of Appeals considered a claim that a teacher violated the Establishment Clause by making controversial comments in class that were hostile to religion in general and to Christianity in particular. The court noted, "we are aware of no prior case holding that a teacher violated the Establishment Clause by appearing critical of religion during class lectures, nor any case with sufficiently similar facts to give a teacher 'fair warning' that such conduct was unlawful." *Id.* at 987. And holding that the teacher lacked notice that the comments might violate the Establishment Clause, the court explained:

> The Supreme Court has long recognized the importance of
> protecting the "robust exchange of ideas" in education, "which

discovers truth 'out of a multitude of tongues.' " *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (quoting *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding * * *." *Id.* (quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957)) (internal quotation marks omitted) * * *. This academic freedom will sometimes lead to the examination of controversial issues. * * *

    In broaching controversial issues like religion, teachers must be sensitive to students' personal beliefs and take care not to abuse their positions of authority. * * * But teachers must also be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities. This balance is hard to achieve, and we must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective.

(Citations omitted.) *Id.* at 988.

{¶ 159} However, the academic freedom of teachers is not without limit. Local school boards are vested with the authority to establish the curriculum and the responsibility to ensure that teachers do not "stray from the established curriculum by injecting religious advocacy into the classroom," such as by teaching creationism in violation of the Establishment Clause. *Webster v. New Lenox School Dist. No. 122*, 917 F.2d 1004, 1007 (7th Cir.1990); *accord Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488, 492 (3d Cir.1998) (holding that academic freedom did not permit professor's classroom tools to inject religious ideals in curriculum materials in contravention of university dictates);

*Piggee v. Carl Sandburg College*, 464 F.3d 667 (7th Cir.2006) (upholding decision not to renew contract of teacher who injected her religious views in cosmetology classes); *Helland v. S. Bend Community School Corp.*, 93 F.3d 327, 331-332 (7th Cir.1996) (concluding that substitute teacher could be removed from list of approved substitutes for failing to follow lesson plans and discussing creationism in a fifth grade science class); *Peloza v. Capistrano Unified School Dist.*, 37 F.3d 517, 521-522 (9th Cir.1994) (holding that biology teacher could be required by the school board to teach evolution and precluded from discussing religion with students).

{¶ 160} But presenting alternative views on scientific theories as a means of challenging students to think critically is not tantamount to promoting religion in the classroom, a fact that the Supreme Court recognized in *Edwards v. Aguillard*, 482 U.S. 578, 594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), when it stated that "teaching a variety of scientific theories about the origins of humankind to schoolchildren might be validly done with the clear secular intent of enhancing the effectiveness of science instruction."

{¶ 161} The record includes testimony from several teachers and reveals that Freshwater began the school year by teaching his students the scientific method and encouraging them to think critically and to distinguish between scientific hypothesis and established fact. Teaching students these critical analytic skills serves a secular purpose, not a religious one, and notably, the school district curriculum recognized that it is beneficial for science students to learn how to critically analyze aspects of scientific theory, including the theory of evolution. At the time Freshwater taught science, the Academic Content Standard for Grade 6-8 science required students to be able to "[e]xplain why it is important to examine data objectively and not let bias affect observations." According to prior standards for life sciences, by the time students completed

tenth grade, they should have understood "how scientists continue to investigate and critically analyze aspects of evolutionary theory."

{¶ 162} Also, the Mount Vernon City School District Bylaws and Policies allowed teachers to address controversial issues that arose while teaching the curriculum, and an administrative guideline for that policy directed teachers to "help students use a critical thinking process * * * to examine different sides of an issue." Evolution is a controversial topic, as Freshwater's fellow eighth grade science teacher, Elle Button, recognized when she testified that students in her class "would question greatly the validity of the theory of evolution." Freshwater permitted his students to raise these questions and also to debate among themselves evolution, intelligent design, and creationism, but he did not participate in those debates. Notably, special education teacher Kerri Mahan, who observed these debates in Freshwater's classroom, testified that the students led the debates and that Freshwater stepped in only when necessary to maintain decorum.

{¶ 163} Further, the evidence vindicates Freshwater's teaching methods because it demonstrates that his students learned evolutionary theory as mandated by the official curriculum. Notably, among the building's three eighth grade science teachers for the 2007-2008 academic year—the last year Freshwater taught at Mount Vernon Middle School—only Freshwater exceeded the state goal of 75 percent of his students passing the science portion of the Ohio Achievement Test. Even more striking is the fact that 89 percent of his students passed the life science section, which assessed, among other topics, students' knowledge of evolutionary theory. In contrast, the students of the other two eighth grade science teachers achieved passage rates of 76 and 67 percent on this section.

{¶ 164} Deborah Strouse, the school district's achievement coordinator, explained that this passage rate shows that Freshwater "did teach the indicators" contained in the Academic Content Standards. Similarly, Mahan, who also served

as the school achievement coach for education, agreed that the Ohio Achievement Test is "a good indicator of what the kids are actually learning" because the test is based on the standards. Mahan also suggested that Freshwater's approach to teaching critical thinking skills in science may have benefited his students on the Ohio Achievement Test because the test assesses "abstract thinking, synthesis, [and] evaluation."

{¶ 165} In addition to this objective evidence, Mahan, who regularly attended Freshwater's classes for almost six years with her special education students, remembered him teaching the evolution section in the textbook. And Andrew Thompson, an intervention specialist who also attended Freshwater's classes, disputed the media's portrayal of Freshwater as "a crazy science teacher who the rest of the staff did not care for or respect" and expressed the opinion that Freshwater taught evolution effectively.

{¶ 166} Further, the record shows that Freshwater did not teach students creationism or intelligent design, either as a substitute for or an alternative to the theory of evolution. The best evidence in the case is Freshwater's own testimony: "I do not teach intelligent design. * * * I teach evolution. I do not teach ID or creationism." He denied attempting to indoctrinate students, nor did he inject his personal religious beliefs into his lessons, explaining: "I do not want creationism taught in the schools. * * * [C]reationism is based on faith. Science is based on scientific method. * * * I wouldn't want my students or my own personal kids to be taught in the schools by somebody that didn't understand or didn't—didn't understand creationism."

{¶ 167} His students and colleagues corroborated his testimony. Various former students testified that Freshwater had never taught creationism or intelligent design in class. For instance, a classmate of the student whose parents threatened to sue the district testified that Freshwater never referred to his Bible in class and never said anything about God, intelligent design, or creationism in the

classroom, and she even noted that Freshwater changed the subject when a student brought up a "higher power." Three other classmates testified that Freshwater did not teach the Bible or his religious beliefs in class, and another agreed that Freshwater did not promote creationism or intelligent design. Mahan, who brought her special education students for inclusion into Freshwater's science class, stated that during the six years she attended his classes, Freshwater taught evolution without mentioning intelligent design to the students. Thompson, who also often attended Freshwater's classes as an intervention specialist, testified that he never witnessed Freshwater teach creationism or intelligent design, and former interim principal Keib observed that he never saw Freshwater "try to push his faith or his philosophical beliefs on anybody that was a student."

{¶ 168} And when Freshwater proposed changing the curriculum in 2003 to adopt an Objective Origins Science Policy, his proposal sought only to "[e]ncourage the presentation of scientific evidence regarding the origins of life and its diversity objectively and *without religious, naturalistic, or philosophic bias or assumption*." (Emphasis added.) As Freshwater explained, he meant "to take a tenth grade standard and put it down to the eighth grade standard to critically analyze evolution." Like the tenth grade standard, his proposal distinguished the secular method of critically examining evolution from teaching intelligent design, and Freshwater confirmed that he did not intend that the proposed standard permit the teaching of religious concepts in science class.

{¶ 169} Thus, the evidence in this case reveals that the school board has misinterpreted Freshwater's effort to challenge students to think critically about evolutionary theory and instead construed his instruction as promoting intelligent design from a creationist perspective. This is a misimpression and contrary to the evidence in this case, and it is not a basis to terminate the contract of a teacher.

{¶ 170} The school board concluded that Freshwater had injected his personal religious beliefs into his plan and pattern of instruction. It apparently assumed that he could not fairly present lessons on evolution and stated that he "not only injected his subjective, biased, Christian religion based, non-scientific opinion into the instruction of eighth grade science students but also gave those students reason to doubt the accuracy and or veracity of scientists, science textbooks, and/or science in general." Yet student scores on standardized tests stand as strong, persuasive evidence of the board's faulty conclusion; those scores instead reveal that Freshwater did teach evolution as mandated by the curriculum. Moreover, teaching students to question and rethink accepted scientific theories is essential to their understanding of the scientific method, the key concept his science students learned in eighth grade. As the United States Supreme Court recognized in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "arguably, there are no certainties in science," and " 'scientists do not assert that they know what is immutably "true"—they are committed to searching for new, temporary, theories to explain, as best they can, phenomena.' " *Id.*, quoting Brief for Nicolaas Bloembergen et al. as Amici Curiae at 9. Thus, there is nothing unscientific in Freshwater challenging students to critically evaluate and question the underlying premises of any scientific theory, including evolution.

{¶ 171} In the last analysis, it is apparent that the board has taken separate, isolated instances where Freshwater allegedly made religious statements sometime between 1994 and 2008 to demonstrate that he injected his personal religious beliefs into his plan and pattern of instruction in the 2007-2008 school year.[8] In 1994, Freshwater gave students information about a seminar supporting

---

8. Many of these incidents are not supported by record evidence. Administrators recalled that Freshwater distributed three "unauthorized" handouts between 2000 and 2007; the content of the first is unknown, the second could not be identified, and the problem with the third was that its source could not be documented. And although the board concluded that Freshwater used the

the Biblical story of creation, and he also provided several handouts challenging evolutionary theory in 2002 or 2003 and in 2006 that the school board viewed as promoting intelligent design. And there is some evidence that Freshwater made off-hand remarks of a religious nature, including one reference to views on homosexuality mentioned by the school board in its termination resolution. In addition, Z.D. testified that sometime during the 2007-2008 school year, Freshwater referred to a "higher being" while discussing the Big Bang theory, suggested that the earth would come "to a fiery end" as foretold by the Bible, and said that Good Friday "should be called the greatest Friday or the best Friday ever." But those isolated statements over an extended period of time do not establish a practice of injecting religious belief into his regular classroom instruction. As the Seventh Circuit Court of Appeals explained in *Webster*, 917 F.2d at 1007, "school boards may not fire teachers for random classroom comments." This is especially true where, as here, the school board has not complained about religious statements or displays in classrooms of other teachers, but rather, has targeted this specific teacher only after he became the subject of a complaint and the board faced a threatened lawsuit.

{¶ 172} Teachers enjoy academic freedom to adopt the pedagogical methods they believe are most effective and are permitted to discuss controversial subjects with students related to the curriculum. Although local school boards have authority to establish the curriculum and may discipline teachers who stray from it by injecting religious advocacy in the classroom, they may not prohibit teachers from mentioning topics that are relevant to teaching the curriculum nor forbid students from considering issues not specifically prescribed by it.

---

movie *Expelled: No Intelligence Allowed* and the video *The Watchmaker* to challenge evolution, a copy of *Expelled* does not appear in the record, and Freshwater did not show *The Watchmaker* in science class; rather, some of his science students saw it during a meeting of the Fellowship of Christian Athletes.

**{¶ 173}** Thus, the school board violated Freshwater's First Amendment rights when it terminated his contract based on its belief that he failed to adhere to the curriculum and that he was instead teaching creationism and intelligent design. Rather, the evidence demonstrates that he encouraged students to critique the theory of evolution to foster their critical thinking skills and to develop their analytical abilities, not to inject his religious beliefs into that instruction. Further, monitoring a student-led debate on evolution, providing handouts critical of evolutionary theory, and making isolated comments over a 20-year career that could be construed as religious does not establish that Freshwater taught creationism or intelligent design in the classroom. To the contrary, the evidence shows that Freshwater excelled in teaching evolutionary theory as part of the science curriculum for eighth grade students.

**{¶ 174}** Accordingly, this record neither demonstrates that Freshwater defied direct orders from school administrators, nor reflects that he taught creationism or intelligent design, nor shows that he strayed from the established curriculum on evolution. The claim of insubordination is not proven by clear and convincing evidence, which is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). Thus, the school board lacked sufficient cause to terminate his contract. I would therefore reverse the judgment of the court of appeals and order his reinstatement with back pay.

**{¶ 175}** For these reasons, I respectfully dissent.

PFEIFER and KENNEDY, JJ., concur in the foregoing opinion.

_____

The Law Office of R. Kelly Hamilton, L.L.C., and R. Kelly Hamilton; and the Rutherford Institute and Rita M. Dunaway, for appellant.

Britton Smith Peters & Kalail Co., L.P.A., David Kane Smith, Krista Keim, and Paul J. Deegan, for appellee.

Appignani Humanist Legal Center and William J. Burgess, urging affirmance for amici curiae American Humanist Association and the Secular Student Alliance.

Mayer Brown, L.L.P., Charles P. Hurley, Richard B. Katskee, and Scott M. Noveck, urging affirmance for amici curiae Americans United for Separation of Church and State and Anti-Defamation League.

Lape Mansfield & Nakasian, L.L.C., and Douglas M. Mansfield, urging affirmance for amici curiae Stephen Dennis and Jenifer Dennis.

Calfee, Halter & Griswold, L.L.P., Christopher S. Williams, Colleen M. O'Neil, and Jeffrey J. Lauderdale, urging affirmance for amicus curiae National Center for Science Education.

_____